1   Charles T. Marshall, Esquire (SBN 176091)
    Law Offices of Charles T. Marshall
2   415 Laurel Street, # 405
    San Diego, California 92101
3   Tel:     619-807-2628
    Fax:     866-575-7413
4   Email: cmarshall@marshallestatelaw.com

5

6   Attorneys for Plaintiffs
    PERRY HOWE and
7   KARINA LEE HOWE

8

9

10              UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13

14  PERRY HOWE and KARINA LEE HOWE   )   Case No.:
                                     )
15       Plaintiffs,                 )   **VERIFIED COMPLAINT**
                                     )
16       v.                          )   1. **Wrongful Foreclosure**
                                     )   2. **Quiet Title**
17                                   )   3. **Slander of Title**
    PNC BANK, N.A. and HSBC BANK USA, )  4. **Fraud**
18  NATIONAL ASSOCIATION as trustee for ) 5. **Cancellation of Instruments**
    LUMINENT MORTGAGE TRUST 2007-2,  )   6. **Violation of Cal. Civ. Code Section**
19  MORTGAGE PASS-THROUGH            )      **2924.6.(c) and (d)**
    CERTFICATES, SERIES 2007-2       )   7. **Violation of Bus. &**
20                                   )      **Profs. Code, Section 17200,** *et seq.*
         Defendants.                 )   8. **Unjust Enrichment**
21                                   )
                                     )
22                                   )
                                     )
23                                   )
                                     )
24                                   )
                                     )   **Jury Trial Demanded**
25  _____ )

26       PERRY HOWE and KARINA LEE HOWE (hereinafter "Plaintiffs") sue PNC BANK, N.A. and

27  HSBC BANK USA, NATIONAL ASSOCIATION as trustee for the certificate holders of

28  LUMINENT MORTGAGE TRUST 2007-2, MORTGAGE PASS-THROUGH CERTIFICATES,

    *Howe v. PNC Bank, N.A., et al.*            VERIFIED COMPLAINT



FILED
NOV 2 6 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CV 13 5476

JSW

SERIES 2007-2 (hereinafter collectively "Defendants"), for wrongful foreclosure, in order to quiet title to their real property, for slander of title, fraud, cancellation of instruments, violation of California Civil Code section 2934a(1)(A) and the California Business & Professions Code, Section 17200 *et seq.*. Plaintiffs also seek restitution for mortgage payments and fees and costs improperly collected by Defendants from them.

A. **PRELIMINARY STATEMENT**

In this case, Plaintiffs maintain that none of the Defendants named to this action is a real party in interest having standing to enforce their mortgage. Nevertheless, in violation of California's non-judicial foreclosure statute, Defendants have scheduled a trustee's sale of Plaintiff's home for **December 9, 2013.**

The secondary mortgage market was created so that mortgagees could turn subprime mortgages into liquid assets and sell them quickly to mortgage-backed securities trusts in order to pass the risk of loss to the investors of those trusts and to obtain quick cash to make more toxic loans. When a mortgage note is sold to a mortgage-backed securities trust, the accompanying deed of trust follows the note but not vice versa. Therefore, when the lender who originated a mortgage loan sells the loan to a MBS trust, its beneficial interest in the loan is extinguished. If this were not the case that would mean that the original lender will always remain the beneficiary with the risk of loss under a mortgage loan notwithstanding the sale, for full value, to an MBS trust. This view completely frustrates the purpose for which the secondary market was created and does not comport with actual banking practices.

Trustees for MBS trusts routinely seek to enforce mortgage loans on behalf of the investors in the trust. In many cases there is no question but that the right of the original lender to enforce a given mortgage loan was extinguished upon the sale to the trust. It is only where, as in this case, the mandated trust chain of title assignments was not followed, that the trustee for the trust and its agents attempt to paper over a botched securitization with fraudulent foreclosure documents in order to proceed with the foreclosure of a non-performing loan.

If this court were to adopt the position that the sale of a mortgage note to the secondary market

does not affect the original lender's power of sale, then the mortgage note and deed of trust would be irrevocably split. A mortgagor could sue the trustee for a securities trust attempting to foreclose pursuant to the provisions of a governing Pooling and Servicing Agreement arguing that only the original lender or a successor lender has the power to enforce the mortgage. This is nonsense and would create chaos in the mortgage industry. *See Cerezo v. Wells Fargo Bank, N.A.* 2013 WL 4029274 (N.D. Cal. Aug. 6, 2013) (the seller of the beneficial interest in a promissory note to a securities trust does not retain the rights to foreclose on property).

In this case, Plaintiffs present evidence that none of the named party defendants is a valid trustee, mortgagee or beneficiary or any of their authorized agents entitled to execute the foreclosure sale of Plaintiffs' property. *See* Cal. Civil Code secttion 2924(a)(1). *See also* Cal. Civ. Code section 2924(a)(6) (a nonjudicial foreclosure may not be initiated by anyone other than the holder of a beneficial interest under the deed of trust, the holder's designated agent or the trustee under the deed of trust). It is important to note that Plaintiffs are not trying to invalidate the MBS trust to which their loan was sold. Frankly, they does not care if the investors in the MBS trust lose their favorable pass-through tax treatment. Instead, Plaintiffs rely on provisions of the trust documents to show that the only reasonable inference to be derived from the belated assignment of their Deed of Trust from PNC Bank, N.A., successor by merger to National City Mortgage, to HSBC BANK USA, National Association as trustee for the certificate holders of the Luminent Mortgage Trust 2007-2 , is that their Note was never properly assigned to HSBC BANK USA, National Association in its capacity as trustee of the mortgage-backed securities trust. As the Deed of Trust follows the Note, there would be no need to assign the Deed of Trust following the Closing Date of the Trust if the mandated chain of title assignments had been followed.

Moreover, Defendant PNC BANK, N.A., through its division, PNC Mortgage, claims a right to collect mortgage payments from Plaintiffs as the purported servicer of their loan. However, PNC Mortgage is not, and never was, a valid servicers. The true beneficiary is unknown after the chain of title the property was irreversibly broken when the original lender sold Plaintiffs' mortgage loan but *failed* to effectively transfer, assign and convey it to the securitization trust for the benefit of the unknown and multiple investors (Certificateholders) who funded the purchase of Plaintiffs' NOTE

and DOT. *See Glaski v. Bank of America, N.A.*, (2013) 218 Cal. App. 4th 1079 (reh'g denied) ([t]he claim that a foreclosure was conducted by or at the direction of a nonholder of mortgage rights often arises where the mortgage has been securitized). Therefore, the "servicing" cannot be, and was never, authorized by the MBS Trust or by the original mortgage lender.

Due to the draconian consequences of foreclosure, compliance with the requirements of California's non-judicial foreclosure statute must be strictly enforced. *Miller v. Cote* (1982) 127 Cal. App. 3d 888, 894. Defendants' failure to comply with the statute's provisions has deprived Plaintiffs of due process of law guaranteed by Art. I, Section 7 of California's Constitution. Moreover, the facts establish that Defendants knowingly and deliberately filed a false assignment and false foreclosure documents in order to paper over and cover up the botched securitization of Plaintiffs' loan. Defendants have acted with malicious intent to collect mortgage payments from Plaintiffs and take their home from her for the purpose of unloading a non-performing loan knowing full well that they have no standing to do so.

A wrongful foreclosure action is the appropriate vehicle for seeking to challenge either a prospective or completed, illegal, foreclosure. *Glaski, supra; Robinson v. Countrywide Home Loans, Inc.*, Case No. E052011 (CA Dist. 4 Ct. App., Div. 2, Sept. 12, 2011) at 7 n.5 ("a borrower who believes that the foreclosing entity lacks standing to do so is not without a remedy. The borrower can seek to enjoin the trustee's sale or to set the sale aside."). Plaintiffs seek punitive damages against defendants predicated on Defendants' knowingly fraudulent conduct sufficient to deter future fraudulent foreclosure activity by Defendants against other property owners.

## A. NAMED PARTIES AND JURISDICTION

1. Plaintiffs reside, and are domiciled, in California. At all material times, Plaintiffs were, and remain, the owners of the Subject Property of this action, which is located at 128 Pinheiro Circle, Novato, Marin County, California 94945 (hereinafter "Property" or "Subject Property").

2. Defendant PNC BANK, N.A. ("PNC") is a nationally chartered bank organized under the laws of the United States with its headquarters located in Pittsburgh, Pennsylvania and its main office located in Wilmington, Delaware as designated in its Articles of Association. PNC Mortgage

1  is a division of Defendant PNC Bank, N.A.

2      3.   Defendant HSBC BANK USA, NATIONAL ASSOCIATION ("HSBC") is a

3  American subsidiary of UK- based HSBC Holdings, and is a national bank with headquarters

4  located at 452 5th Avenue, New York, N.Y. 10018. HSBC's national charter lists its main office as

5  located in McLean, Virginia. HSBC is sued solely in its capacity as trustee of the above-captioned

6  MBS trust.

7      4.   This Court has jurisdiction of this action as the residential real property which is

8  the subject of this action is situated in Marin County, California and the acts complained of

9  occurred in Novato, California. The amount in controversy exceeds $75,000 and there exists

10 complete diversity of the parties hereto.  Therefore, this court has jurisdiction of this action pursuant

11 to 28 U.S.C. section 1332.

12 **B. MATERIAL FACTS COMMON TO ALL COUNTS**

13     5.   On February 20, 2007, Plaintiff executed a Deed of Trust ("DOT") and Promissory Note

14 for a hybrid 5-year fixed 10-year interest-only mortgage loan product relating to the  Subject

15 Property.  The DOT identifies National City Mortgage, a division of National City Bank, as the

16 lender and National City Bank as the trustee.  The mortgage loan was assigned Loan Number

17 0005394564. The original mortgage loan documents were recorded on February 27, 2007.  A true

18 and correct copy of the DOT and Promissory Note are attached hereto as **Exhibit "A"** and

19 incorporated by reference  as though fully set forth herein.

20     6.   The original loan servicer was National City Bank. The current servicer is PNC

21 Mortgage, a division of PNC Bank, N.A. as successor by merger to National City Mortgage

22 Company a division of National City Bank.

23     7.   Plaintiffs' mortgage loan was sold to the Luminent Mortgage Trust 2007-2, Mortgage

24 Pass-through Certificates, Series 2007-2 Trust ("Luminent Mortgage Trust 2007-2") on or

25 before May 1, 2007, the Closing Date of the Trust. Defendant HSBC BANK USA serves as trustee

26 for the MBS Trust.  Documents governing the administration of the Trust and filed with the SEC

27 include the Free Writing Prospectus filed on April 24, 2007, the Pooling and Servicing Agreement

28 ("PSA") dated April 1, 2007 and filed on  May 25, 2007, as Form 8-K for May 1, 2007, Ex. 99.1,

the Flow Master Seller's Warranties & Servicing Agreement, filed with the SEC on May 25, 2007 as Form 8-K for May 1, 2007 Ex. 99.2 and the Assignment, Assumption & Recognition Agreement dated April 17, 2007 and filed with the SEC on May 25, 2007, as Form 8-K for May 1, 2007 Ex. 99.4.

8.  The Free Writing Prospectus contains a Mortgage Loan Schedule which lists the specified pooled mortgage loans that back the securities (bond) certificates issued by the REMIC MBS trust. The Subject Loan is listed on the loan schedule under its original Loan No. 5394564. The loan was later assigned Trust Sequence/ Loan No. 0240692385. *See* Free Writing Prospectus ("FWP"), pages 14, 29, 49, 66, 85,102, 117,132 and 156. Due to its volume, the FWP is not attached hereto but is available for reviewing in its entirety at http://www.secinfo.com/d1A335.u27.htm.

9.  Section 12.05 of the governing PSA provides that the Luminent Mortgage Trust 2007-2 is a New York trust governed by New York law. New York Estates, Powers & Trusts Law section 7-2.4 provides: "If the trust is expressed in an instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust… is void." The statutory purpose is "to protect trust beneficiaries from unauthorized actions by the trustee". Due to its volume, the PSA is not attached to this Complaint but is available for review in its entirety at http://www.secinfo.com/d1A325.uk.c.htm .

10.  The Luminent Mortgage Trust 2007-2 is a Special Purpose Vehicle formed as a mortgage-backed securities trust with an election and continuing qualification as a real estate mortgage investment conduit ("REMIC") in accordance with the Internal Revenue Tax Code of 1986, as amended. Upon election and continuing qualification as a REMIC, the income of the trust, *i.e.*, the scheduled mortgagors' payments, is taxed only at the Certificate Holder's (investor's) level.

11.  Pursuant to Section 860 of the Internal Revenue Code, in order for an investment entity to qualify as a REMIC,  all steps in the contribution and transfer of the notes must be a "true and "complete" sale between the parties in order to achieve bankruptcy remoteness. Upon formation of the REMIC-qualified MBS Trust, the Depositor sells the pooled mortgage loans in exchange for the securities certificates issued by the trust. Each step of the "true sale" process must be supported by effective delivery and certification of acceptance of the receiving party of the endorsed mortgage

1  note and assigned deed of trust, reflecting the complete intervening assignments and transfers of

2  each mortgage loan from each assignor to the last assignee.

3      12.  The Pooling and Servicing Agreement governing this securitization, in accordance with

4  the requirements of the Tax Code of 1986, provides that only the Depositor, and no other entity, is

5  permitted to make the final assignment and transfer of each mortgage loan to the REMIC MBS trust,

6  and the assignment must be made as of the Closing Date of the trust to maintain the favorable pass-

7  through tax status of the trust entity.  In addition, only performing qualified mortgage loans which

8  are not in default may be placed into the REMIC MBS trust.  Once the trust owns a mortgage loan,

9  only the trustee of the MBS trust has the authority to foreclose, to appoint an agent to foreclose, to

10 assign the deed of trust or substitute a trustee under the deed of trust.

11     13.  The securitization of the subject mortgage loan is a transaction designed to comply with

12 the aforementioned requirements of the Tax Code. Specifically, original lender National City

13 Mortgage sold the Subject Mortgage Loan in a verified securitization transaction on or before April

14 1, 2007, to JPMorgan Mortgage Acquisition Corporation ("JPMMAC") JPMMAC was the initial

15 and interim whole loan Purchaser pursuant to a standing Flow Master Seller's Warranties &

16 Servicing Agreement ("FMSW&SA") filed with the SEC on May 25, 2007 as Form 8-K for May 1,

17 2007, Ex. 99.2.  The FMSW &SA is available for viewing at

18 http://www.secinfo.com/d1A325.uk.a.htm. This was the first sale of the subject mortgage loan,

19 without recourse, on or before April 1, 2007 but without an effective assignment and transfer to

20 JPMMAC.

21     14.  Thereafter, pursuant to a binding Assignment, Assumption & Recognition Agreement

22 ("AA&RA"), dated April 17, 2007, JPMMAC re-sold the pooled mortgage loans as specified in a

23 Mortgage Loan Schedule (which includes the Subject Loan) to securitization Seller MAIA Mortgage

24 Financial Statutory Trust. The AA&RA was filed with the SEC on May 25, 2007 as Form 8-K for

25 May 1, 2007 Ex. 99.4.  This was the second sale of the subject mortgage loan, without recourse, on

26 or before April 17, 2007, but again without its effective intervening assignment and transfer to

27 MAIA.

28     15.  Pursuant to the PSA, MAIA irrevocably sold the pooled mortgage loans, including

Plaintiffs' loan, to LARES ASSET SECURITIZATION, Inc. ("Lares"), the securitization Depositor, who formed the Luminent Mortgage Trust 2007-2. Thereafter, in exchange for the securities certificates in 26 classes, backed by the securitized mortgage loans, Depositor Lares represented and warranted under oath that it irrevocably sold the mortgage loans, including Plaintiffs' loan, to HSBC Bank USA as Trustee for the Luminent Mortgage Trust 2007-2. This was the third sale of the mortgage loan, without recourse, but again without the required intervening assignment and transfer.

16. Therefore, notwithstanding the warranties and representations of the securitization parties in the PSA, Plaintiffs' mortgage loan was without the required intervening assignment of the DOT and endorsement of the underlying original mortgage note to HSBC Bank USA on or before the closing date of the MBS Trust. For this reason, the multiple sales of the loan did not comply with the binding trust agreements in violation of New York trust law.

17. As the securitization Depositor never received an effective assignment of the DOT and Note endorsement, Luminent Mortgage Trust 2007-2 could not, and did not, effectively assign and transfer the mortgage loan to HSBC Bank USA as Trustee for the MBS trust on or before the Trust's Closing Date of May 1, 2006. The Closing Date is the absolute deadline (plus a 90-day allowance in certain circumstances) for the trustee to receive a contribution of a qualified mortgage loan asset into the Trust's fund.

18. The governing PSA clearly defines the valid conveyance and complete chain of transfer for each mortgage loan to the MBS trust. Pursuant to the strict terms of the PSA, only Depositor Lares may contribute and assign the mortgage loans to the trust on or before its Closing Date. Defendant PNC Bank was not the Depositor. This Tax Code requirement is necessary to preserve and maintain the separation and bankruptcy remoteness of the original lender and/or loan originator from the MBS Trust. HSBC Bank USA may only accept a late mortgage assignment within 90 days after May 1, 2007, the Trust's Closing Date. Moreover, HSBC Bank USA may only accept a contribution of a "substitute mortgage loan" after the Trust's Closing Date as a replacement of a non-qualified and defective loan. However, such a contribution must be completed no later than two years after the Trust's Closing Date.

19. On May 22, 2007, National City Mortgage, a division of National City Bank, assigned all beneficial interest in Plaintiffs' Deed of Trust to National City Mortgage Co., a subsidiary of National City Bank. The Assignment of Deed of Trust was improperly recorded in the Sonoma County Recorder's Office on June 7, 2007. A true and correct copy of the Assignment of Deed of Trust is attached hereto as **Exhibit "B"** and incorporated by reference as though fully set forth herein.

20. On July 19, 2010, LSI Title Company, agent for Cal-Western Reconveyance Corporation, executed and recorded a Notice of Default ("NOD") against the Plaintiffs.   A true and correct copy of the NOD is attached hereto as **Exhibit "C"** and incorporated by reference as though fully set forth herein.

21. The NOD states that "NOTICE IS HEREBY GIVEN:  CAL-WESTERN RECONVEYANCE CORPORATION is either the original trustee, the duly appointed or substituted trustee, or acting as agent for the trustee or beneficiary under a deed of trust dated February 20, 2007 executed by PERRY HOWE AND KARINA LEE HOWE…."  The NOD also contains the following statement:

> That by reason thereof the present beneficiary under such Deed of Trust has deposited with said trustee such Deed of Trust and all documents evidencing obligations secured thereby and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The NOD does not specifically identify the "present beneficiary" but states that "[t]o find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason:  contact: PNC MORTGAGE, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION SBM TO NATIONAL CITY MORTGAGE, A DIVISION OF NATIONAL CITY BANK."

22. Cal. Civ. Code Section 2924 (a)(1) provides that only the trustee, mortgagee or beneficiary, or any of their authorized agents, may file a NOD. Section 2924(a)(1)(C) further provides that the NOD must include a statement setting forth the nature of each breach actually known to the beneficiary. Here, Defendant PNC was not a valid beneficiary when the NOD was

issued against the Plaintiffs. Similarly, Defendant PNC was not a valid loan servicer and Cal-Western was not substituted as trustee by a valid beneficiary or in a lawful substitution document. Therefore, Cal-Western was not a valid trustee as a trustee has no independent powers but serves only as agent for a legitimate beneficiary or servicer.

23. On April 16, 2010, Cal-Western, as attorney in fact for PNC Mortgage, a division of PNC Bank, N.A., successor by merger to National City Mortgage, a division of National City Bank, purported to substitute Cal-Western for National City Bank as trustee under Plaintiffs' Deed of Trust. The Substitution of Trustee was not notarized until August 6, 2010 and was not recorded until September 14, 2010. A true and correct copy of the Substitution of Trustee is attached hereto as **Exhibit "D"** and incorporated by reference as though fully set forth herein.

24. On June 20, 2011 Cal-Western issued a Notice of Trustee's Sale ("NOTS 1") against the Plaintiffs. The scheduled trustee's sale did not take place. NOTS 1 was recorded on June 27, 2011. A true and correct copy of the Notice of Trustee's sale is attached hereto as **Exhibit "E"** and incorporated by reference as though fully set forth herein.

25. On May 31, 2012, PNC Bank, National Association as successor by merger to National City Mortgage, a division of National City Bank purported to assign all beneficial interest in Plaintiffs' Deed of Trust to HSBC Bank USA, National Association as Trustee for Luminent Mortgage Trust 2007-2. The fraudulent[1] and felonious[2] Assignment of Deed of Trust is a sham document which constitutes a clumsy attempt to obscure the false title assertions to the Subject Property by Defendants. When the assignment was executed, Plaintiff was in default of her loan

---

[1] Cal. Penal Code §532(f)(a) provides that "a person commits mortgage fraud if, with the intent to defraud, the person does any of the following ... (4) files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain a deliberate misstatement, misrepresentation, or omissions."

[2] California Penal Code Section 115 provides that: Any person who knowingly procures or offer any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine might be filed, registered or recorded under any law of this state or of the United States, is guilty of a felony.

obligations. *See* Exhibit "C". The fact that HSBC would purchase a non-performing mortgage loan is further evidence that the assignment is knowingly fraudulent and therefore void. Defendant PNC was not a valid beneficiary and had no power to make the assignment in the first place as its beneficial interest in Plaintiff's DOT was extinguished in 2007, when it sold the loan to the Luminent Mortgage Trust 2007-2. Moreover, all defendants knew that Defendant HSBC was the true, albeit invalid, beneficiary as trustee for the MBS Trust. Defendants conspired to file this sham document only in preparation for the foreclosure sale of Plaintiffs' home to unload a non-performing loan knowing that none of them had authority to do so. For all of the foregoing reasons, the Assignment is fraudulent, null and void. A true and correct copy of the Assignment of Deed of Trust is attached hereto as **Exhibit "F"** and incorporated by reference as though fully set forth herein.

26. The 2012 Assignment of Deed of Trust establishes two facts. First, the assignment proves that Plaintiffs' Deed of Trust was sold to the Luminent Mortgage Trust 2007-2 on or before May 1, 2007, the Closing Date of the Trust. Second, the belated and illegal assignment proves that the attempted securitization of Plaintiffs' mortgage loan failed as the late assignment of Plaintiffs' DOT in 2012, would not have been necessary if the intervening assignments and endorsements to the securitization participants had been made pursuant to the mandates of the governing trust documents.

27. On August 8, 2012, Cal-Western issued a second Notice of trustee's Sale ("NOTS 2") against the Plaintiffs falsely purporting to be the duly appointed trustee under Plaintiff's Deed of Trust. The NOTS was recorded on August 17, 2012. The scheduled sale did not take place. A true and correct copy of the Notice of Trustee's Sale is attached hereto as **Exhibit "G"** and incorporated by reference as though fully set forth herein.

28. In a letter dated September 18, 2013, PNC wrote to Plaintiffs requesting additional information in order to complete the processing of their application for a loan modification. The letter states:[p]lease complete and return the following documents by 10/3/2013". Plaintiffs faxed the requested documents; specifically the most recent federal tax return, including all pages and schedules, on September 26, 2013- well before the deadline fixed by PNC. The letter also states

"[w]e will attempt to reach you by telephone frequently to obtain the requested documentation and answer any questions that you may have regarding this request".

29. However, instead of working with Plaintiffs to modify the terms of their loan, on September 20, 2013, just two days after writing to Plaintiffs requesting additional information to process their loan modification application, Cal-Western executed a Notice of Trustee's Sale against the Plaintiffs scheduling the foreclosure sale of their property for October 16, 2013. Clearly, the September 18 letter was a ruse designed to lull Plaintiffs into a false sense of security that foreclosure activities would not continue while loan modification negotiations were pending. A true and correct copy of the September 18, 2013 letter is attached hereto as **Exhibit "H"** and incorporated by reference as though fully set forth herein.

30. On September 20, 2013, Cal-Western issued a third Notice of Trustee's Sale ("NOTS 3") against Plaintiff Perry Howe. NOTS 3 was recorded on September 24, 2013. The trustee's sale scheduled for October 16, 2013 has been postponed to **December 9, 2013**. A true and correct copy of NOTS 3 is attached hereto as **Exhibit "I"** and incorporated by reference as though fully set forth herein.

31. **Defendant HSBC never issued a Notice of Default against the Plaintiffs in violation of Cal. Civil Code section 2924 (a) (1), (a)(1)(C) and (6).**

32. Due to the draconian consequences of a non-judicial foreclosure, strict compliance with the statute's provisions is required. *Miller v. Cote* (1982) 127 Cal. App. 3d 888, 894 (a trustee sale based on a statutorily deficient notice of default is invalid).

33. As a result of the failure of the securitization of Plaintiff's mortgage loan, **and** egregious violations of California's non-judicial foreclosure statute, none of the named defendants to this law suit is, or was, a real party in interest with standing to enforce Plaintiffs' mortgage loan or to collect mortgage payments from them.

## C. CAUSES OF ACTION

### COUNT I: WRONGFUL FORECLOSURE

#### (Against All Defendants)

34. Plaintiffs re-allege and incorporate by this reference the allegations contained in the

1  foregoing paragraphs as though set forth fully herein.

2      35.  A trustee is an agent of the beneficiary of a mortgage loan and unlawful conduct of the
3  trustee may be imputed to the principal beneficiary.

4      36.  A trustee has a duty not to conduct an illegal, fraudulent or willfully oppressive sale of
5  property under a power of sale contained in a deed of trust.

6      37.  A trustee is also liable to a trustor or mortgagor in California upon the basic principle of
7  tort liability enunciated in Civil Code §1708 that every person is bound by law not to injure the
8  person or property of another or infringe on any of his rights. *See also Munger v. Moore,* (1970) 11
9  Cal. App.3d 1, 7-8.

10     38.  On May 31, 2012, Defendants PNC, HSBC and their agent, Cal-Western, conspired to
11  file a fabricated, fraudulent  Assignment of Plaintiffs' Deed of Trust with PNC falsely stating that it
12  held a beneficial interest in Plaintiffs' mortgage loan and the power as beneficiary to convey the
13  Deed of Trust to HSBC, as trustee for the Luminent Mortgage Trust 2007-2. In fact, PNC held no
14  interest as beneficiary or otherwise when the assignment was attempted in 2012 as its status as
15  beneficiary was extinguished in 2007 when Plaintiffs' loan was sold to the MBS Trust.

16     39. Defendants PNC and HSBC directed Cal-Western to initiate the foregoing
17  foreclosure proceedings against Plaintiffs based on the illegal and knowingly fraudulent assignment
18  of Plaintiffs' DOT and knowingly fraudulent and void foreclosure documents filed by Cal-Western
19  at the behest of its principal (whether PNC or HSBC) that also violate the requirements of
20  California's non-judicial foreclosure statute.

21     40.  The Assignment of Plaintiffs' Deed of Trust to HSBC as trustee  for the
22  Luminent Mortgage Trust 2007-2 occurred five **years** after the Closing Date of the Trust in
23  contravention of the governing trust documents and New York law. For the foregoing reasons, the
24  Assignment is fraudulent, null and void.

25     41.  Significantly, HSBC as the new, albeit unlawful beneficiary, never issued a NOD
26  against Plaintiffs in violation of the most fundamental requirement of California's non-judicial
27  foreclosure statute. Notices of default  are not transferrable from one beneficiary to a new one.
28  Section 2924(a)(6) of the non-judicial foreclosure statute mandates that:

> No entity shall record or cause a notice of default to be recorded or otherwise initiate the foreclosure process unless it is the holder of the beneficial interest under the mortgage or deed of trust, the original trustee or the substituted trustee under the deed of trust, or the designated agent of the holder of the beneficial interest. No agent of the holder of the beneficial interest under the mortgage or deed of trust, original trustee or substituted trustee under the deed of trust may record a notice of default or otherwise commence the foreclosure process except when acting within the scope of authority designated by the holder of the beneficial interest.

Cal. Civil Code section 2924(a)(6). *See also* Cal. Civil Code section 2924(a)(1).

Cal. Civil Code section 2924(a)(1)(C) further mandates that the NOD include a statement setting forth the nature of each breach **actually known** to the beneficiary.

42. Cal-Western was not acting within the scope of authority designated by HSBC, the current holder of the beneficial interest under Plaintiffs' DOT. Furthermore, the statement of t the nature of the breaches of mortgage obligations set forth in the NOD issued against Plaintiffs were the breaches purportedly actually known to PNC, not HSBC.

43. Therefore, NOTS 2, recorded on August 8, 2012, and NOTS 3, recorded on September 24, 2013, and any foreclosure sale of Plaintiffs' property based on the NOD or NOTS 3, are illegal, null and void foreclosure activities. The foreclosure activities against the Plaintiffs are illegal and void notwithstanding the fact that PNC has no beneficial interest to convey to HSBC in the first place.

44. Defendants PNC and HSBC caused Cal-Western, their agent, to breach its duty of care to Plaintiffs by directing Cal-Western to initiate foreclosure proceedings against Plaintiffs based on the illegal and knowingly fraudulent assignment of Plaintiffs' DOT and knowingly fraudulent and void foreclosure documents filed by Cal-Western at the behest of its principal (whether PNC or HSBC) that also violate the requirements of California's non-judicial foreclosure statute.

45. Defendant PNC has impermissibly attempted to collect mortgage payments from Plaintiffs on behalf of itself and HSBC in its capacity as trustee for the Luminent Mortgage Trust 2007-2, an invalid creditor.

46.  PNC and HSBC and their agent Cal-Western, have acted with willful oppressiveness and malice toward the Plaintiffs.

47.  Plaintiffs have suffered damages proximately caused by the illegal and fraudulent foreclosure activities against them by Defendants PNC and HSBC and Cal-Western including but not limited to the imminent sale of their home, severe emotional distress, mortgage payments wrongfully paid to PNC and its divisions, which had no authority to collect such payments, increased costs and fees assessed against them associated with the wrongful foreclosure activities, *and inter alia*, damage to their credit. Plaintiffs have also had to pay fees to their forensic mortgage loan auditor and attorney to protect their constitutional and property rights.  Plaintiffs are entitled and seek punitive damages against PNC and HSBC as a result of the illegal, fraudulent and willfully oppressive foreclosure activities against Plaintiff s that defendants personally conducted as well as those committed by Cal-Western at their direction.

**WHEREFORE,** Plaintiffs request judgment in Plaintiffs' favor and an order of the Court:

(a) Awarding compensatory damages in an amount to be proved at trial;

(b) Emotional distress damages in an amount to be proved at trial;

(c) Punitive damages in an amount sufficient to deter similar conduct on the part of the Defendants in the future; and

(d) Enjoining the Defendants' foreclosure activities against Plaintiffs as illegal and void,  and directing that title to the Subject Property be vested in Plaintiffs, alone, as owners in fee simple.

## COUNT II:  QUIET TITLE

### (Against Defendants PNC and HSBC)

48.  Plaintiffs re-allege and incorporate the preceding paragraphs by reference as though fully set forth herein.

49.  Plaintiffs are the owners  and are entitled to possession of the real property located at 128 Pinheiro Circle, Novato, Marin County, California 94945; APN 125-592-11. A true and correct copy of the full legal description of the Subject Property is attached to the Deed of Trust as Exhibit "A".

50. Defendant PNC claims a right to collect mortgage payments and associated costs and fees as purported servicer of Plaintiffs' loan. *See, e.g.,* PNC Mortgage Statement, dated November 24, 2009, a true and correct copy of which is attached hereto as **Exhibit "J"** and incorporated by reference as though fully set forth herein. Defendant HSBC claims to hold the beneficial interest in Plaintiffs' loan with the power of sale under the Deed of Trust following the illegal assignment of Plaintiffs' DOT to it as trustee for the Luminent Mortgage Trust 2007-2. *See* Ex. "F" hereto. The claims of Defendants PNC and HSBC are adverse to Plaintiffs' claims because HSBC is not a holder of the NOTE, cannot prove any interest in the NOTE or that the NOTE is secured by the DOT, as well as for the reasons set forth in the causes of action *supra* and *infra*. PNC is not a valid servicer entitled to collect mortgage payments from Plaintiffs as HSBC is not a valid beneficiary with authority to appoint PNC as the loan servicer. As such, neither PNC nor HSBC has a right, title, lien, or interest in the Subject Property.

51. Plaintiffs seek to quiet title against the claims of Defendants PNC and HSBC and all persons, known and unknown, claiming any legal or equitable right, title, estate, lien, or adverse interest in the Subject Property as of the date the Verified Complaint was filed (Cal. Code Civ. Proc. §760.020). Plaintiffs allege that Defendants claim an interest in the property adverse to that of Plaintiffs herein. However, the claims of said Defendants are without any right whatsoever, and said Defendants have no legal or equitable right, claim, or interest in the property. Plaintiffs therefore seek a declaration that the title to the Subject Property is vested in Plaintiffs alone, free and clear of encumbrances in favor of Defendants and persons known and unknown, and that the Defendants herein and persons known and unknown, and each of them, be declared to have no estate, right, title, lien or interest in the Subject Property and that said Defendants and persons known and unknown, and each of them, be forever enjoined from asserting any estate, right, title, lien or interest in the Subject Property adverse to Plaintiffs herein. Plaintiffs seek an order from this court instructing the clerk of the court to execute in recordable form a deed of reconveyance to Plaintiffs' Property.

52. Plaintiffs are not required to tender any outstanding mortgage debt because the Defendants seeking to collect the debt are without standing to do so and because the trustee's sale of their property has not yet occurred. Furthermore, any arrearages are more than offset by the

1  damages suffered by Plaintiffs due to the fraudulent, illegal activities and statements of the
2  Defendants.

3      **WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as**
4  **hereinafter set forth.**

5                          ### COUNT III: SLANDER OF TITLE

6                          **(Against PNC and HSBC)**

7      53.  Plaintiffs reaffirm and re-allege the preceding paragraphs as if set forth fully
8  herein.

9      54.  Defendants PNC and HSBC made false statements in the assignment and foreclosure
10  documents described with specificity in Paragraphs 7 through 31 and 33-45, above, which are
11  incorporated by reference in this Count III. For example, in the illegal assignment, *see* ¶¶25-26,
12  *supra*, PNC fraudulently purports to confer all beneficial interest in Plaintiffs' loan, which it did not
13  hold, on Defendant HSBC as trustee for the Luminent Mortgage Trust 2007-2. *See* Ex. "F".
14  Further, Cal-Western issued the NOD knowing that it is not a duly appointed or substituted trustee
15  under Plaintiff's DOT. In addition, the statements in the NOD (Ex. "C") fraudulently claim that
16  PNC is the beneficiary.  In Notices of Trustee's Sale 1, 2 and 3 (Exhibits E, G, H hereto), Cal-
17  Western falsely claims to be the duly appointed trustee authorized to exercise the power of sale on
18  behalf of the purported beneficiary, that is, PNC as to NOTS 1 and HSBC as to NOTS 2 and 3.  But,
19  as alleged in foregoing paragraphs, Cal-Western is not a valid trustee, PNC was never a valid
20  beneficiary and HSBC is not a valid beneficiary.

21      55.  These false statements were made with malicious intent by PNC and HSBC, as trustee
22  and their agents for the purpose of initiating and pursuing illegal foreclosure activity against the
23  Plaintiffs and to exact mortgage payments from them without the authority to do so.

24      56.  These false statements were published with malicious intent and without any
25  justification whatsoever. Therefore, they are not privileged.

26      57.  The recording of the foregoing Assignment of Deed of Trust on May 31, 2012, Notice
27  of Default and NOTS 2 and 3 have cast a cloud on the title to Plaintiffs' Property as they allege that
28  Defendants and their agents have no power to enforce their mortgage.

58.  Plaintiffs have suffered direct pecuniary loss as they have made mortgage payments to PNC who had no authority to collect them.  Payment to the wrong party has no effect on a borrower's mortgage obligations.  Plaintiffs still owe the payments to the party with standing to collect them.  Plaintiffs have also wrongly been assessed foreclosure fees and costs by the Defendants.  In addition, Plaintiffs are required to pay the fees of their forensic loan auditor and attorneys to uncover and address the fraudulent and illegal conduct of the Defendants.

**WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as hereinafter set forth.**

### COUNT IV: FRAUD

#### (Against PNC and HSBC)

59.  Plaintiffs re-allege and incorporate by this reference the allegations contained in the foregoing paragraphs as though set forth fully herein.

60. On or about May 22, 2007, National City Mortgage, a division of National City Bank, fabricated an assignment of Plaintiffs' Deed of Trust to National City Bank for National City Mortgage, a division of National City Bank to cover up the botched securitization of Plaintiffs' loan. The document is clearly fraudulent. As Plaintiffs' mortgage loan had already been sold to the Luminent Mortgage Trust 2007-2, for value received, National City Mortgage no longer had any beneficial or other interest in Plaintiffs' loan to convey to any entity.

61. The fraudulent assignment was executed by Jeff Blum, Supervisor with National City Mortgage and recorded in the land records of Sonoma County even though the Subject Property is located in Marin County.

62. On July 19, 2010, C.Y. Kong of LSI Title Company, as agent of Cal-Western Reconveyance Corporation, in turn, acting on behalf of PNC, executed a Notice of Default and Election to Sell Under Deed of Trust against the Plaintiffs. The NOD was recorded in the Marin County Assessor-Recorder's Office on the same day. The NOD falsely identifies PNC Mortgage, a

division of PNC Bank, National Association successor by merger to National City Mortgage, a division of National City Bank as the beneficiary under the DOT. PNC could not have been the beneficiary under Plaintiffs' DOT as Plaintiffs' loan had been sold in 2007 to the MBS trust for which Defendant HSBC serves as trustee.

63. The fraudulent NOD contains the following deliberate misrepresentation:

That by reason thereof the present beneficiary under such Deed of Trust has deposited with said trustee such Deed of Trust and all documents evidencing obligations secured thereby and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

*See* Exhibit "C" hereto. The foregoing statement is knowingly false because PNC knew that its predecessor in interest, National City Mortgage, had sold Plaintiff mortgage to the Luminent Mortgage Trust 2007-2 on or before May 1, 2007, the closing Date of the Trust. The fraudulent NOD was issued by PNC, the purported loan servicer, for the purpose of unloading Plaintiffs' non-performing loan on behalf of Defendant HSBC in its capacity as trustee for the Luminent Mortgage Trust 2007-2. This ruse was devised by PNC and HSBC because the securitization of Plaintiffs' loan failed depriving HSBC of any beneficial or other interest in Plaintiffs' mortgage as well as the power of sale.

64. On May 31, 2012, PNC Bank, by Trisha Payton, authorized signer, executed a fraudulent Assignment of Deed of Trust attempting to assign and transfer to HSBC Bank, National Association as Trustee for Luminent Mortgage Trust 2007-2, "all beneficial interest under that certain Deed of Trust dated February 20, 2007, executed by Perry Howe and Karina Lee Howe"....The face of the Assignment states that it was prepared by the San Diego law firm of Pite Duncan, LLP. The Assignment was published when it was recorded in the records of the Marin County Recorder's Office on June 27, 2012. The fact that defendants retained legal counsel to prepare what should be a routine assignment document lends further support to Plaintiffs' allegations that: 1) Plaintiffs'

mortgage was sold to the MBS Trust in 2007 whereupon National City Mortgage's interest in the mortgage was extinguished; 2) the securitization was ineffective; and 3) that the purpose of the fraudulent assignment was to cover up the botched securitization.

65.   On April 16, 2010, Yvonne J. Wheeler, Assistant Vice President for PNC Mortgage, a division of PNC Bank, N.A. successor by mortgage to National City Mortgage, a division of National City Bank by Cal-Western Reconveyance Corporation as attorney –in-fact executed a Substitution of Trustee.  The Substitution purports to substitute Cal-Western Reconveyance Corporation for National City Bank as trustee under Plaintiffs' Deed of Trust. The document contains the following false statement: "WHEREAS, the undersigned is present Beneficiary under said Deed of Trust".... As explained with particularity above, PNC was not a valid beneficiary and had no authority to substitute the trustee. The Substitution was not notarized by Jeffrey Starling until August 6, 2010- nearly four months after Wheeler executed the document giving rise to a plausible inference that Wheeler did not personally appear before Starling and that Starling's following statement is knowingly false:

> On Aug 06 2010, before me, Jeffrey Starling, a Notary Public, personally appeared Yvonne J. Wheeler who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

The Substitution was published on September 14, 2010 when it was recorded in the Assessor-Recorder's Office of Marin County.

66. Notices of Trustee's Sale 2 and 3 are fraudulent documents because, following the May 31, 2013 Assignment to HSBC, although it purported to be the new beneficiary under Plaintiffs' Deed of Trust, nevertheless, HSBC failed to file a Notice of Default. No Notice of Trustee's Sale can be issued before three months have lapsed following issuance of a Notice of

1  Default by the current beneficiary. Therefore, NOTS 2 and 3 are fraudulent and void.

2      67. The next fraud perpetrated on the Plaintiffs is evidenced by the September 18, 2013 letter
3
   from PNC to Plaintiffs setting a deadline of October 3, 2013 to submit additional documentation to
4
   support their application for a loan modification. *See* Exhibit "H" hereto.
5
6      68. This was a deliberately false deadline as only two days after the date of the letter, on
7  September 20, 2013, PNC direct Cal-Western to issue a Notice of Trustee's Sale scheduling a
8  foreclosure sale of Plaintiffs' property for October 16, 2013. The letter also contains the following
9  false statement:
10
        We will attempt to reach you by telephone frequently to obtain the requested documentation
11      and answer any questions that you may have regarding this request.
12 The foregoing statement is clearly deliberately false as defendants never contacted, or attempted to
13 contact, Plaintiffs regarding the requested information but, instead, immediately, issued a Notice of
14 Trustee's Sale. The misrepresentations in the September 18 letter were made to further the illegal
15
   scheme devised by the defendants to sell Plaintiffs' property in foreclosure knowing that they had no
16
   authority to do so.
17
18     69. Plaintiffs justifiably relied on Defendants' false representations and suffered harm
19 as a direct result of these deliberately false representations. Specifically, the issuance of the
20 fraudulent May, 2012 assignment of DOT was necessary for the initiation of foreclosure
21 proceedings. HSBC failed to issue a NOD. The ensuing illegal Notices of Trustee's Sale have
22 resulted in the imminent sale of Plaintiffs' Property. As the Assignment and foreclosure documents
23 filed by and on behalf of PNC and HSBC appeared to be lawful land records, Plaintiffs were duped
24 into relying on the accuracy of these fraudulent documents and did not take measures to protect her
25 property and constitutional rights. In addition, PNC deliberately misrepresented to Plaintiffs that
26 they were in loan modification negotiations whereas, in fact, defendants were illegally pursuing the
27 foreclosure of their property. Defendants' fraud has also negatively impaired Plaintiffs'
28 creditworthiness. Plaintiffs have made mortgage payments to PNC which has no authority to collect

1  them and have been assessed costs and fees associated with the wrongful foreclosure activities of

2  Defendants. In addition, Plaintiffs have suffered severe emotional distress as a result of the fraud

3  and subterfuge perpetrated upon them by the Defendants.  Facing the imminent loss of their home,

4  Plaintiffs paid a forensic mortgage loan auditor and attorney who advised them that PNC and HSBC

5  have no authority to enforce their mortgage loan.

6        70.  Defendants PNC and HSBC, and each of them, have acted intentionally

7  and with malice and oppression against Plaintiffs entitling Plaintiffs to an award of exemplary and

8  punitive damages.

9      **WHEREFORE, Plaintiffs pray for judgment as set forth below.**

10

11                      **COUNT V: CANCELLATION OF INSTRUMENTS**

12                              **(Against PNC and HSBC)**

13        71.  Plaintiffs refer to and incorporate herein by this reference the allegations contained

14  in the foregoing paragraphs as though set forth fully herein.

15        72.  Plaintiffs allege that the written instruments created, published and recorded by the

16  Defendants herein are void or voidable as to them and if left outstanding, will cause serious injury to

17  them.  Plaintiffs therefore request this Court to adjudge and order Defendants to deliver up the

18  NOTE, DOT, Assignments of Deed of Trust, Notice of Default and Election to Sell Under Deed of

19  Trust, Substitution of Trustee and September 20, 2013 Notice of Trustee's Sale  so that they may be

20  canceled, or in the alternative, to declare these documents to be without force and effect and further

21  to instruct the clerk of the Court to sign a Deed of Reconveyance so that the cloud on Plaintiffs'

22  property may be removed.

23        73.  Plaintiffs are further informed and believe and thereon allege that under Civ. Code

24  §3413, for a Deed of Trust to be subject to a cause of action for cancellation, the instrument must

25  appear to be valid.  At the time Plaintiffs executed the DOT and NOTE, said documents appeared to

26  be valid as uniform instruments related to real property transactions. Similarly, the foreclosure

27  documents described with particularity in Counts III and IV; specifically, the Assignments of Deed

28  of Trust, Substitution of Trustee, NOD and September 20, 2013 Notice of Trustee Sale appear on

their face to be valid land records.

74. Plaintiffs allege that neither PNC nor HSBC has recorded documents showing any legally effective assignment of the DOT to them and that, therefore, neither defendant had standing to institute a foreclosure action against Plaintiffs' property. In other words, no Defendant has enforceable rights against Plaintiffs' property.

75. As shown in Counts III and IV, the assignments and foreclosure documents; specifically, the Assignments of Deed of Trust, NOD, Substitution of Trustee and September 20, 2013 Notice of Trustee Sale executed by Defendants are fraudulent and violate California's non-judicial statute and penal law and ought to be cancelled.

**WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as hereinafter set forth.**

## COUNT VI: VIOLATION OF CAL. CIV. CODE SECTION 2924.b(c)-(d)
### (Against PNC BANK)

76. Plaintiffs re-allege and incorporate by this reference the allegations contained in the foregoing paragraphs as though set forth fully herein.

77. California Civil Code §2924.b.(c) provides, in pertinent part, the following:

> If a borrower submits a complete application for a first lien loan modification offered by, or through, the borrower's mortgage servicer, a mortgage servicer, mortgagee, trustee, beneficiary or authorized agent shall not record a notice of default or notice of sale or conduct a trustee's sale while the complete first lien loan modification application is pending. A mortgage servicer, mortgagee, trustee, beneficiary or authorized agent shall not record a notice of default or notice of sale or conduct a trustee's sale until any of the following occurs:
>
> > (1) The mortgage loan servicer makes a written determination that the borrower is not eligible for a first lien loan modification and any appeal period pursuant to subdivision (d) has expired.
>
> Section 2924.b. (d) provides that:
> If the borrower's application for a first lien loan modification is denied, the borrower shall have at least 30 days from the date of the written denial to appeal the denial and to provide evidence that the mortgage servicer's determination was in error.

The foregoing provisions were added to the California non-judicial foreclosure statute by the Homeowner's Bill of Rights Act and became effective January 1, 2013. They were added to address the wide-spread practice of "dual-tracking" by the banking industry, *i.e.*, pursuing loan modification negotiations and foreclosure activity simultaneously.

78. In its letter to Plaintiffs, dated September 18, 2013, PNC, the loan servicer, gave Plaintiffs until October 3, 2013 to submit their most recent federal tax return in order to complete its review of their application for a loan modification. In issuing the September 20, 2013 Notice of Trustee Sale, PNC breached its promise to allow Plaintiffs until October 3rd to submit the tax return.

79. Plaintiffs submitted the requested tax return by fax on September 26, 2013, well before the deadline designated by PNC. Therefore, but for PNC's breach of its promise to allow Plaintiffs until October 3, 2013 to provide the tax return, Plaintiffs' loan modification application would have been complete.

80. PNC never denied Plaintiffs' loan modification application nor did it contact Plaintiffs regarding their application after they sent the September 18, 2013 letter requesting the federal tax return.

81. Cal. Civil Code section 2924.6.(c) and (d) is a remedial statutory provision designed to protect struggling property owners from the abusive practice of dual-tracking by banks. As such, it must be construed in favor of the borrower.

82. Defendant PNC is in violation of Cal. Civil code section 2924.b.(c) and (d).

**WHEREFORE, Plaintiffs pray for judgment against Defendant PNC as hereinafter set forth.**

## COUNT VII: VIOLATION OF BUSINESS AND PROFESSIONS CODE, §17200 *et seq.*

### (Against PNC and HSBC)

83. Plaintiffs refer to and incorporate by this reference the allegations contained in the foregoing paragraphs as though set forth fully herein.

84. California Business and Professions Code §17200 et seq. prohibits acts of unfair competition, which means and includes any "fraudulent business practice" and conduct which is "likely to deceive" and is "fraudulent" within the meaning of §17200. As more fully described above, the acts and practices of Defendants are likely to deceive, constituting a fraudulent business act or practice. *See*, in particular, foregoing ¶¶ 17-19, 21-25, 32-37, 52-61. This conduct is ongoing and continues to this day.

85. Specifically, and as set forth with greater particularity in preceding paragraphs, the named Defendants, and each of them, have engaged and are engaging in deceptive business practices with respect to mortgage servicing, assignments of deeds of trust and the filing of fraudulent foreclosure documents and related matters by, *inter alia*:

   a.     Executing false and misleading documents, including fabrication of the May, 2007 Assignment of Deed of Trust by National City Mortgage (PNC) and the May, 31, 2012 Assignment of Deed of Trust by PNC and HSBC, the filing of the fraudulent Substitution of Trustee at the direction of PNC, the fraudulent NOD filed on behalf of PNC and Notice of Trustee's Sale 1 filed at the direction of PNC. In addition, PNC and HSBC both directed their agent, Cal-Western to file Notices of Trustee's Sale 2 and 3. PNC and HSBC caused these fraudulent documents to be filed to cover up the botched securitization of Plaintiffs' mortgage loan;

   b.     Executing documents without the legal authority to do so ( PNC- the NOD, Substitution of Trustee,  May, 2012 Assignment and NOTS 1) (PNC and HSBC- NOTS 2 and 3) ;

   c.     Acting as beneficiaries and trustees without the legal authority to do so (PNC, HSBC and Cal-Western at the direction of both defendants);

   d.     Failing to comply with California Civil Code §§1572,1708 and1709 (PNC,

HSBC);

      e.      Violating provisions of the non-judicial foreclosure statute set forth at California Civil Code §§ 2924(a) (1), 2924(a) (1) (C) (PNC and HSBC), 2924.b. (c)-(d) and 2934(a) (1) (A) (PNC).

      f.      Committing a felony under §115 of the California Penal Code (PNC and HSBC);

      g.      Committing mortgage fraud within the meaning of Cal. Penal Code §532(f)(a) (PNC and HSBC);  and

      h.      Engaging in other deceptive practices (PNC- violation of the prohibition against dual tracking) and any other deceptive practices which may be uncovered during the course of discovery.

86. Plaintiffs allege that the named Defendants' misconduct, as alleged herein, gave, and has given, Defendants, and each of them, an unfair competitive advantage over their competitors.  The scheme implemented by Defendants, in collusion with one another, is specifically designed to defraud California consumers and enrich Defendants at the expense of consumers in this State.

87. By reason of the foregoing, Defendants should be enjoined from continuing such practices pursuant to California Business & Professions Code §§17203 and 17204.   Plaintiffs have suffered injury in fact, including but not limited to, the imminent loss of title to their home, severe emotional distress, damage to their creditworthiness and mortgage payments paid to PNC which had no right to collect mortgage payments from Plaintiff. Undoubtedly, other members of the public, similarly have fallen victim to Defendants' deceptive schemes, are likely to be injured as well.

88. The harm to Plaintiffs and to members of the general public outweighs the utility (if any) of Defendants' policies and practices. Consequently, their policies and practices constitute unlawful business acts or practices within the meaning of Business & Professions Code §17200. Moreover, the foregoing conduct promotes an incipient violation of a consumer law, or violates the policy or spirit of such law or otherwise significantly threatens or harms competition.

89. Plaintiffs are therefore entitled to injunctive relief and attorney's fees as available under Business & Professions Code §17200 *et seq.* and related sections and under any California private attorney general statutes. The acts and practices described in the foregoing paragraphs are

1  unfair and violate the Business & Professions Code because they constitute violations of all the

2  statutes previously listed above.

3  **WHEREFORE, Plaintiffs pray the Court for an Order and Decree that**:

4  a.     Pursuant to Business & Professions Code §17203, Defendants PNC, HSBC and

5  Cal-Western, their successors, agents and assigns, representatives, employees, and all persons who

6  act in concert with them, are permanently enjoined from committing all acts of unfair competition in

7  violation of §17200 including, but not limited to, the violations identified in  Count III and IV of

8  Plaintiffs' Complaint;

9  b.     Plaintiffs are entitled to an award of statutory attorney's fees including those

10  available under Cal. Code Civ. Pro. 1021.5;

11  c.     Plaintiffs are entitled to statutory damages including damages available under

12  relevant private attorney general statutes such as CCP 1021.5;

13  d.     Plaintiffs are entitled to the cost of suit; and

14  e.     Any other relief the Court deems just and proper.

15

16  **COUNT VIII: UNJUST ENRICHMENT**

**(Against PNC)**

17

18  90.  Plaintiffs refer to and incorporate by this reference the allegations contained in the

19  foregoing paragraphs as though set forth fully herein.

20  91.  Defendant PNC claimed rights to payments on Plaintiffs' Loan as the

21  purported valid servicer of Plaintiffs' mortgage loan.  There is no evidence that the MBS Trust for

22  which HSBC serves as trustee retained PNC as loan servicer.  In any event, the securitization of

23  Plaintiffs' loan failed; therefore, HSBC, as trustee, had no authority to appoint PNC or anyone else

24  to service Plaintiffs' loan.

25  92.  Plaintiffs, in fact, have made payments to PNC pursuant to and in reliance

26  upon PNC's claim to rights to such payments.

27  93.  As alleged hereinabove, PNC does not have rights to such payments.

28  PNC, falsely purporting to be servicer of Plaintiffs' loan, has collected mortgage payments from

Plaintiffs for the benefit of HSBC, an invalid beneficiary. PNC had knowledge of such circumstances giving rise to unjust enrichment at the time of claiming rights to payment from Plaintiffs on the loan. PNC acquired a benefit at the expense of Plaintiffs without Plaintiffs' knowledge or consent.

94. There exists no express contract between Plaintiffs and PNC governing the collection of mortgage payments and foreclosure fees and expenses.

95. PNC received a benefit from Plaintiffs for money had and received. It is unjust for PNC to retain the benefit at the expense of Plaintiffs.

**WHEREFORE,** Plaintiffs request that this Court issue an Order and Decree that PNC had no right to payments on the loan and that PNC shall return to Plaintiffs all payments made to it.

### PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as set forth below: The damages claimed by Plaintiff exceed $75,000.**

1. For an order forever enjoining the defendants, and each of them, their agents, representatives, successors and assigns, from initiating and pursuing foreclosure and eviction activity against the Plaintiffs relating to the Subject Property;

2. For an order determining that PNC and HSBC, and each of them, have no estate, right, title, lien or interest in said Property;

3. For a judgment forever enjoining said defendants, and each of them, from claiming any estate, right, title, lien or interest in the Subject Property;

4. For a judgment that neither PNC nor HSBC has any unencumbered legal interest in both the NOTE and DOT;

5. Plaintiffs further pray that the Court issue an Order and Decree canceling the NOTE, Deed of Trust, Assignments of Deed of Trust, the NOD, Substitution of Trustee and Notice of Trustee's Sale recorded on September 24, 2013 finding same void as to Plaintiffs and that the Court instruct the clerk to execute a full deed of reconveyance of the Deed of Trust in favor of Plaintiffs.

6.      For a finding that Defendant PNC has been unjustly enriched in an amount according to proof and that the same, with interest at the legal rate, shall be reimbursed to Plaintiffs.

7.      For general, consequential and special damages according to proof;

8.      For punitive damages in an amount sufficient to deter the fraudulent conduct set forth with particularity in Court IV of this Complaint in the future;

9.      For reasonable attorney's fees;

10.     For costs of suit herein; and

11.     For such other and further relief as the court deems just and proper.


                                          LAW OFFICES OF CHARLES T. MARSHALL

Dated: November 26, 2013                  By:
                                          Charles T. Marshall
                                          Attorney for Plaintiffs
                                          PERRY HOWE and KARINA LEE HOWE

## VERIFICATION

I, PERRY HOWE, declare as follows:

I am a Plaintiff in this action, and I hereby declare I have read the foregoing Verified Complaint and know the contents thereof and believe that the matters stated therein are true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

I hereby declare under the penalty of perjury, that the foregoing is true and correct.

This verification was executed this 26th day of November, 2013 in Danville, California.



_____
**Perry Howe (Plaintiff)**

## VERIFICATION

I, KARINA LEE HOWE, declare as follows:

I am a Plaintiff in this action, and I hereby declare I have read the foregoing Verified Complaint and know the contents thereof and believe that the matters stated therein are true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

I hereby declare under the penalty of perjury, that the foregoing is true and correct

This verification was executed this 26th day of November, 2013 in Danville, California.



_____
**Karina Lee Howe  (Plaintiff)**

# Exhibit "A"

22
R
MH

RECORDED AT REQUEST
OF CAL LAND TITLE

2007-0012525

Recording Requested By:
JODI SCHAFF

Return To:

National City Bank
P.O. Box 8800
Dayton, OH 45401-8800

Prepared By:
JODI SCHAFF

National City Bank
P.O. Box 8800
Dayton, OH 45401-8800

319196 -KNM

125.572.11

| Recorded | REC FEE | 72.00 |
| Official Records | | |
| County of | | |
| Marin | | |
| JOAN C. THAYER | | |
| Assessor-Recorder | | |
| | BJ | |
| 08:36AM 27-Feb-2007 | Page 1 of 22 | |

0005394564

——————— [Space Above This Line For Recording Data] ———————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **February 20, 2007**
together with all Riders to this document.
(B) "Borrower" is

PERRY HOWE and KARINA LEE HOWE Husband and Wife

Borrower's address is    128 PINHEIRO CIR NOVATO, California 94945
                                             . Borrower is the trustor under this Security Instrument.
(C) "Lender" is National City Mortgage a division of
National City Bank
Lender is a    National Banking Association
organized and existing under the laws of   United States

CALIFORNIA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01

-6(CA) (0207)
Page 1 of 15                    Initials: PH VAH

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is
3232 NEWMARK DRIVE, MIAMISBURG, OH  45342

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is    NATIONAL CITY BANK

(E) "Note" means the promissory note signed by Borrower and dated  **February 20, 2007**
The Note states that Borrower owes Lender
**EIGHT HUNDRED SIXTY SIX THOUSAND THREE HUNDRED TWENTY & 00/100**          Dollars
(U.S. $    **866,320.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than    **March 1, 2037**
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

VMP-6(CA) (0707)                      Page 2 of 16                      Initials: _____   Form 3005  1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Sonoma :

[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]


SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF



Parcel ID Number:   125-592-11 CODE AREA 10-033          which currently has the address of
              128 PINHEIRO CIR,                                                    [Street]
              NOVATO                            [City] , California   94945   [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(CA) (0207)          Page 3 of 18          Initials. _____          Form 3005  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all

Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to

Initials: _PH_ _LULF_

the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

-6(CA) (0207)                          Page 9 of 16                    Initials: _PH_ _BALt_                Form 3005  1/01

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall

VMP -6(CA) (0207)

Page 10 of 15

Initials: *PH*

Form 3005 1/01

not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

Initials. _____

Form 3005  1/01

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials: _PV VHH_

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                             PERRY HOWE               -Borrower

_____                    _____ (Seal)
                                             KARINA  LEE  HOWE         -Borrower


_____ (Seal)             _____ (Seal)
                -Borrower                                             -Borrower


_____ (Seal)             _____ (Seal)
                -Borrower                                             -Borrower


_____ (Seal)             _____ (Seal)
                -Borrower                                             -Borrower

State of California    *CA*

County of    *Marin*                                           } ss.

On    *Feb. 23, 2007*          before me,   L. Magana, notary public
                                                                                    personally appeared

Perry Howe and Karina Lee Howe

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_L. Magana_ _____ (Seal)

L. MAGANA
COMM. #1711844
NOTARY PUBLIC - CALIFORNIA
MARIN COUNTY
COMM. EXPIRES DEC. 18, 2010

*Exhibit "A"*

**DESCRIPTION**

---

ESCROW NO. 319196 KNM

ALL THAT CERTAIN real property situate in the City of Novato, County of Marin, State of California, described below as follows:

PARCEL ONE:

Lot 96, as shown upon that certain Map entitled "Map of Atherton Ranch, Being a Subdivision of Parcel B, 4 PM 29, Lands of Atherton Ranch, LLC 2001 OR 527 Marin County Records, Novato, California", filed for record August 2, 2002 in Volume 2002 of Maps, at Page 148, Marin County Records.

PARCEL TWO:

A non-exclusive easement for private storm drainage over that portion of Lot 95, as shown upon that certain Map entitled "Map of Atherton Ranch, Being a Subdivision of Parcel B, 4 PM 29, Lands of Atherton Ranch, LLC 2001 OR 527 Marin County Records, Novato, California", filed for record August 2, 2002 in Volume 2002 of Maps, at Page 148, Marin County Records, designated as "10' PSDE IFO 96-103", upon said map.

PARCEL THREE:

A non-exclusive easement for private storm drainage over that portion of Lot 94, as shown upon that certain Map entitled "Map of Atherton Ranch, Being a Subdivision of Parcel B, 4 PM 29, Lands of Atherton Ranch, LLC 2001 OR 527 Marin County Records, Novato, California", filed for record August 2, 2002 in Volume 2002 of Maps, at Page 148, Marin County Records, designated as "10' PSDE 95-103", upon said map.

0005394564

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this    20th    day of
February 2007                        , and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the
"Security Instrument") of the same date, given by the undersigned (the "Borrower") to
secure Borrower's Note to
National City Mortgage a division of
National City Bank

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:

128 PINHEIRO CIR, NOVATO, California 94945

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in

(the "Declaration").  The Property is a part of a planned unit development known as
THE HILLS AT ATHERTON RANCH

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association
or equivalent entity owning or managing the common areas and facilities of the PUD (the
"Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the
PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii)
articles of incorporation, trust instrument or any equivalent document which creates the
Owners Association; and (iii) any by-laws or other rules or regulations of the Owners
Association. Borrower shall promptly pay, when due, all dues and assessments imposed
pursuant to the Constituent Documents.

MULTISTATE  PUD  RIDER - Single  Family - Fannie  Mae/Freddie  Mac  UNIFORM
INSTRUMENT
Form 3150 1/01

[image_ref] -7R (0411)

Page 1 of 3                    Initials: PV KAH
VMP Mortgage Solutions, Inc. (800)521-7291

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials: _PH_ _VAH_

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
-Borrower

_____ (Seal)
PERRY HOWE                -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
KARINA LEE HOWE           -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

-7R (0411)                Page 3 of 3                Form 3150 1/01

0005394564

# ADJUSTABLE RATE RIDER

(Index: Six-Month London Interbank Offered Rate ("LIBOR") As Published in *The Wall St. Journal* – Rate Caps)
(Assumable After Initial Period ) (45 Day Lookback)

This Adjustable Rate Rider is made this   20th   day of   February   ,   2007 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note as amended and supplemented by the Interest Only Payment Period Note Addendum to Adjustable Rate Note (collectively the "Note") to   National City Mortgage
  a division of National City Bank

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

   128 PINHEIRO CIR , NOVATO , California 94945

[Property Address]

**THE NOTE PROVIDES FOR A PERIOD OF MONTHLY PAYMENTS OF INTEREST ONLY FOLLOWED BY MONTHLY PAYMENTS OF BOTH PRINCIPAL AND INTEREST. THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INITIAL INTEREST RATE AND MONTHLY PAYMENT DURING AND AFTER THE INTEREST ONLY PAYMENT PERIOD. THE NOTE ALSO LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

   **ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of   6.000 %. The First Principal and Interest Due Date is the first monthly payment date after the one hundred twentieth (120th) monthly payment is due. The Note provides for changes in the interest rate and the monthly payments as follows:
4.     **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   (A)     **Change Dates**
The interest rate I will pay may change on the first day of   March 2012   , and may change on that day every sixth (6th) month thereafter. Each date on which my interest rate could change is called a "Change Date."
   (B)     **The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.
The "Index" is the six month Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

   If the Index is no longer available, the Note Holder will choose a new index based upon comparable information. The Note Holder will give me notice of this choice.

ADRJDI1

6 Month LIBOR Interest Only Rider - Multistate
120 Interest Only Payments
Assumable after Initial Period
(08/05)

(C)     Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 3/4THS percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine my new monthly payment as follows:

            (i)     Interest Only Payment Period.  For monthly payments due after the first Change Date up to but not including the First Principal and Interest Due Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to pay the interest that accrues on the unpaid principal that I am expected to owe at the Change Date at my new interest rate determined above in this Section 4(C). The result of this calculation will be the new amount of my Interest Only Payment until the next Change Date unless I make a partial Prepayment as provided in Section 5 of the Note.

            (ii)    Principal and Interest Payments Due Beginning With the First Principal and Interest Due Date.  For monthly payments due on or after the First Principal and Interest Due Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate determined above in this Section 4(C) in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D)     Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.000 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE percentage points ( 1.000 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 11.000 %.

(E)     Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first payment date after the Change Date until the amount of my monthly payment changes again.

(F)     Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.      TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
**1.          UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE IN EFFECT AS FOLLOWS:**

            Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

            If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

ADRIDI2

Page 2 of 3

6 Month LIBOR Interest Only Rider - Multistate
120 Interest Only Payments
Assumable after Initial Period
(08/05)

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.     AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
PERRY HOWE              Borrower          KARINA LEE HOWE         Borrower

_____ (Seal)          _____ (Seal)
                       Borrower                                 Borrower

_____ (Seal)          _____ (Seal)
                       Borrower                                 Borrower

_____ (Seal)          _____ (Seal)
                       Borrower                                 Borrower
                                                         [Sign Original Only]

# ADJUSTABLE RATE NOTE

(6-Month LIBOR Index - Rate Caps)
(Assumable after Initial Period) (45 Day Lookback)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

February 20, 2007

[Date]                                    [City]                                    [State]

128 PINHEIRO CIR, NOVATO, California 94945

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 866,320.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is National City Mortgage

a division of National City Bank .
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.000 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on April 1 , 2007 .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on March 1, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

National City Mortgage Co. P O Box 54828, Los Angeles, CA 90054-0828
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 5,194.03 . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index (Assumable after Initial Period) (45 Day Lookback) - Single Family - Freddie Mac UNIFORM INSTRUMENT

VMP-174N (0406)                    Form 5524 5/04

VMP Mortgage Solutions, Inc (800)521-7291

Page 1 of 6                    Initials _____



## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of     **March 2012**               , and may change on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding   **TWO AND 3/4THS**
                              percentage point(s) (          **2.750**        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than     **11.000**          % or less than     **2.750**            %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than      **ONE**                          percentage point(s) (  **1.000**        %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than
        **11.000**        %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Form 5524 5/04
Initials: _____

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of __15__ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be __5.00__ % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

VMP-174N (0406)

Page 3 of 5

Form 5524 5/04

Initials: _____

(A) UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Form 5324 5/04

Initials: _____

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)  
PERRY HOWE                     -Borrower

_____ (Seal)  
KARINA LEE HOWE                -Borrower

_____ (Seal)  
                               -Borrower

_____ (Seal)  
                               -Borrower

_____ (Seal)  
                               -Borrower

_____ (Seal)  
                               -Borrower

_____ (Seal)  
                               -Borrower

_____ (Seal)  
                               -Borrower

*[Sign Original Only]*

# INTEREST ONLY PAYMENT PERIOD NOTE ADDENDUM
## TO ADJUSTABLE RATE NOTE

*(Index: Six-Month London Interbank Offered Rate ("LIBOR") As Published in The Wall St. Journal – Rate Caps)*
*(Not to be Used for Texas Homestead Loans Unless Proceeds Used Only for Purchase Money or Refinance of Purchase Money)*

## THIS ADDENDUM TO NOTE PROVIDES FOR A PERIOD OF MONTHLY PAYMENTS OF INTEREST ONLY FOLLOWED BY MONTHLY PAYMENTS OF BOTH PRINCIPAL AND INTEREST. THE INTEREST RATE AND MONTHLY PAYMENT CAN CHANGE DURING AND AFTER THE INTEREST ONLY PAYMENT PERIOD. THIS ADDENDUM LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

This Interest Only Payment Period Note Addendum to Adjustable Rate Note (this "Addendum") is made this 20th day of **February , 2007** and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note of the same date (the "Note") given by the undersigned (the "Borrower") to evidence Borrower's indebtedness to **National City Mortgage a division of**
**National City Bank**
(the "Lender"), which indebtedness is secured by a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), of the same date and covering the property described in the Security Instrument and located at:

128 PINHEIRO CTR , NOVATO .

California 94945 .

ADDITIONAL COVENANTS:   Unless specifically defined in this Addendum, any capitalized terms shall have the same meaning as in the Note. Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower further covenants and agrees as follows:

1. The Note is modified to provide that the initial one hundred twenty (120) payments due consist of interest only on the unpaid principal balance of the Note ("Interest Only Payment Period") at the interest rates determined in accordance with Section 2 of the Note and Section 4 of this Addendum. Sections 3, 4, 5 and 7(A) of the Note are hereby restated as follows:

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay interest on the unpaid principal balance of this Note during the Interest Only Payment Period, and principal and interest thereafter, by making payments every month.

I will make my monthly payments on the first day of each month beginning on **April    2007** . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and, if the payment includes both principal and interest, it will be applied to interest before principal. If, on **March 1st , 2037** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **National City Mortgage Co. P O Box 54828 , Los Angeles, CA 90054-0828** or at a different place if required by the Note Holder.

IOADD-1                      Page 1 of 4                     Addendum to Adjustable Rate Note
(Form 5522/194N & 5524/174N)
120 Interest Only Payments
6-Month LIBOR Index
(08/05)

### (B) Amount of My Interest Onl

Each of my initial    Sixty        (        60  ) monthly payments will be in the amount of
U.S. $ 4,331.60     . The next    Sixty      (        60  ) monthly payments may change in
accordance with Sections 3(C) and 4(C)(i) below. These payments are called the "Interest Only Payments." No
payments of principal are due during the Interest Only Payment Period. The Interest Only Payments will not
reduce the principal amount of this Note.

### (C) Monthly Payment Changes and Date of First Principal and Interest Payment

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the
interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my
monthly payment in accordance with Sections 4 and 5 of this Addendum.

The date of my first payment consisting of both principal and interest on this Note (the "First Principal
and Interest Due Date") is  April 1st , 2017           , which is the first monthly payment date after the
one hundred twentieth (120th) monthly payment is due.

Before the First Principal and Interest Due Date, my monthly payment may change to reflect changes in
the interest rate as provided in Section 4(C) of this Addendum. My payment may also change if I make a partial
Prepayment as provided in Section 5 of this Addendum. Before the effective date of any change in my monthly
payment, the Note Holder will deliver or mail to me a notice of the change as provided in this Note.

Beginning with the First Principal and Interest Due Date, my monthly payment will change to an amount
sufficient to repay the unpaid principal and interest at the rate described in Section 4(C) of this Addendum in
substantially equal payments by the Maturity Date.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of  March 2012         and may change
on that day every sixth (6th) month thereafter. Each date on which my interest rate could change is called a
"Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-
month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The
most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND 3/4THS            percentage point(s) (    2.750 %) to the Current Index. The
Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).
Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next
Change Date. The Note Holder will then determine my new monthly payment as follows:

Addendum to Adjustable Rate Note
(Form 5522/194N & 5524/174N)
120 Interest Only Payments
6-Month LIBOR Index
(08/05)

(i)     **Interest Only Payment Period.** For monthly payments due after the first Change Date up to but not including the First Principal and Interest Due Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to pay the interest that accrues on the unpaid principal that I am expected to owe at the Change Date at my new interest rate determined above in this Section 4(C). The result of this calculation will be the new amount of my Interest Only Payment until the next Change Date unless I make a partial Prepayment as provided in Section 5 of this Addendum.

(ii)    **Principal and Interest Payments Due Beginning With the First Principal and Interest Due Date.** For monthly payments due on or after the First Principal and Interest Due Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate determined above in this Section 4(C) in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (A) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than   11.000 % or less than       2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than       ONE             percentage points (     1.000 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 11.000  %.

### (B) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (C) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. If I make a partial Prepayment during the Interest Only Payment Period, the amount of the monthly payment will decrease until the next Change Date. At the next Change Date during the Interest Only Payment Period, any reduction due to a partial Prepayment may be offset by an interest rate increase. If I make a partial Prepayment after the First Principal and Interest Due Date, my partial Prepayment may reduce the amount of my monthly payments starting with the next Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 7.    BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)    Late Charges for Overdue Payments

If the Note Holder has not received the full amount of my monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  5.00                         % of my overdue payment of interest, during the Interest Only Payment Period, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

II. All other provisions of the Note are unchanged by this Addendum and remain in full force and effect.

By signing below, Borrower accepts and agrees to the terms and conditions contained in this Interest Only Payment Period Note Addendum to Adjustable Rate Note.

_____ (Seal)                    _____ (Seal)
Borrower **PERRY HOWE**                                  Borrower **KARINA LEE HOWE**

_____ (Seal)                    _____ (Seal)
Borrower                                                 Borrower


I understand that if I only make Interest Only Payments during the Interest Only Payment Period, at the end of the Interest Only Payment Period the principal balance will not be reduced.

_____ (Seal)                    _____ (Seal)
Borrower **PERRY HOWE**                                  Borrower **KARINA LEE HOWE**

_____ (Seal)                    _____ (Seal)
Borrower                                                 Borrower

                                                              (Form 5522/194N & 5524/174N)
                                                              120 Interest Only Payments
                                                              6-Month LIBOR Index
                                                              (08/05)

# Exhibit "B"

# Exhibit "C"

07/10/2010 08:49 FAX 19486   185

2010-0034303

**Recording Requested By**
**When Recorded Mail To**

Cal-Western Reconveyance Corp.
P.O. Box 22004
525 East Main Street
El Cajon CA 92022-9004

Recorded       | REC FEE    21.00
Official Records |
County of      |
Marin          |
JOAN C. THAYER |
Assessor-Recorder |
                 |
                 | a
01:05PM 19-Jul-2010 | Page 1 of 2

*1277628-11*  *NOOXR*
Trustee Sale No. 1277628-11
APN: 125-592-11

Space Above This Line For Recorder's Use

Loan No. XXXXXX4564 Ref: HOWE, PERRY
Property Address: 128 PINHEIRO CIR, NOVATO CA 94945

# NOTICE OF DEFAULT

## IMPORTANT NOTICE

IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN
YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may
have legal right to bring your account in good standing by paying all of your past due payments plus
permitted costs and expenses within the time permitted by law for reinstatement of your account, which
is normally five business days prior to the date set for the sale of your property. No sale date may be set
until three months from the date this notice of default may be recorded (which date of recordation
appears on this notice). This amount is $32,758.42 as of July 19, 2010, and will increase until your
account becomes current. While your property is in foreclosure, you still must pay other obligations
(such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make
future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other
obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist
that you do so in order to reinstate your account in good standing. In addition, the beneficiary or
mortgagee may require as a condition to reinstatement that you provide reliable written evidence that
you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the
entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even
though full payment was demanded, but you must pay all amounts in default at the time payment is
made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time
the notice of sale is posted (which may not be earlier than the end of the three-month period stated above)
to, among other things, (1) provide additional time in which to cure the default by transfer of the
property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1)
and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the
obligation being foreclosed upon or a separate written agreement between you and your creditor permits
a longer period, you have only the legal right to stop the sale of your property by paying the entire
amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your
property is in foreclosure for any other reason, contact:
PNC MORTGAGE, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION SBM TO NATIONAL
CITY MORTGAGE, A DIVISION OF NATIONAL CITY BANK

C/O CAL-WESTERN RECONVEYANCE CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON        9004 CA 92022-9004
(619)590-9200

If you have any questions, you should contact a lawyer or the governmental agency which may have
insured your loan.

NODCA                          rev 04/15/10                          Page 1 of 2

2

7/19/2010 08:50 FAX 19400 185          FNDS-WESTERN STATES                    ☑ 003

**Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure. Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

NOTICE IS HEREBY GIVEN:

**CAL-WESTERN RECONVEYANCE CORPORATION is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a deed of trust dated February 20, 2007 executed by**

**PERRY HOWE AND KARINA LEE HOWE HUSBAND AND WIFE as trustor, to secure certain obligations in favor of NATIONAL CITY MORTGAGE A DIVISION OF NATIONAL CITY BANK A NATIONAL BANKING ASSOCIATION as beneficiary, recorded as document 2007-0012525 on February 27, 2007 in book XX page XX official records in the office of County Recorder of MARIN County, California, describing land therein as:**

COMPLETELY DESCRIBED IN SAID DEED OF TRUST,

said obligations including a promissory note for the principal sum of $866,320.00.
That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Failure to pay the monthly payment due January 1, 2010 of principal and interest and subsequent installments due thereafter; plus late charges; together with all subsequent sums advanced by beneficiary pursuant to the terms and conditions of said deed of trust.

**That by reason thereof the present beneficiary under such Deed of Trust has deposited with said trustee such Deed of Trust and all documents evidencing obligations secured thereby and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.**

**The mortgagee, beneficiary or authorized agent for the mortgagee or beneficiary pursuant to California Civil Code § 2923.5(b) declares that SB1137 does not apply.**

T.S. 1277628-11
Dated:    July 19, 2010          **CAL-WESTERN RECONVEYANCE CORPORATION**

                                  Signature By _____

                                                            **C. Y. Kong**
                                  **LSI TITLE COMPANY, AS AGENT**

NODCA                    rev 04/15/10                         Page 2 of 2

# Exhibit "D"

RECORDING REQUESTED BY:

AND WHEN RECORDED MAIL TO:

CAL-WESTERN RECONVEYANCE CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004

2010-0044884

| Recorded | REC FEE | 21.00 |
|---|---|---|
| Official Records | | |
| County of | | |
| Marin | | |
| JOAN C. THAYER | | |
| Assessor-Recorder | | |
| | OH | |
| 12:15PM 14-Sep-2010 | Page 1 of 2 | |

2

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBSTITUTION OF TRUSTEE

LOAN NO:XXXXXX4564          T.S. NO.:1277628-11

WHEREAS, PERRY HOWE AND KARINA LEE HOWE HUSBAND AND WIFE was the original Trustor,
NATIONAL CITY BANK was the original Trustee, and NATIONAL CITY MORTGAGE A DIVISION OF
NATIONAL CITY BANK A NATIONAL BANKING ASSOCIATION was the original Beneficiary under that certain
Deed of Trust dated February 20, 2007 and recorded on February 27, 2007 as Instrument No. 2007-0012525, in book XX,
page XX of Official Records of MARIN County, California, and

WHEREAS, the undersigned is present Beneficiary under said Deed of Trust, and WHEREAS, the undersigned desires to
substitute a new Trustee under said Deed of Trust in the place and stead of present Trustee thereunder, in the manner in
said Deed of Trust provided.

NOW, THEREFORE, the undersigned hereby substitutes, CAL-WESTERN RECONVEYANCE CORPORATION a
California Corporation whose address is 525 EAST MAIN STREET, P.O. BOX 22004, EL CAJON CA 92022-9004 as
Trustee under said Deed of Trust. Whenever the context hereof so requires, the masculine gender includes the feminine
and/or neuter, and the singular number includes the plural.

Dated: 4/16/2010

PNC MORTGAGE, A DIVISION OF PNC BANK, N.A.,
SBM TO NATIONAL CITY MORTGAGE, A DIVISION OF
NATIONAL CITY BANK BY CAL-WESTERN
RECONVEYANCE CORPORATION AS ATTORNEY-IN-
FACT

Yvonne J. Wheeler, A.V.P.

State of CALIFORNIA )
County of SAN DIEGO)
On ___AUG 0 6 2010___ before me, _____Jeffrey Starling_____,
a Notary Public, personally appeared _____Yvonne J. Wheeler_____, who proved to me on
the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within Instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.                                      (Seal)

WITNESS my hand and official seal

Signature _____

JEFFREY STARLING
COMMISSION # 1858755
Notary Public - California
SAN DIEGO COUTY
My Comm. Expires Jul 24 2013

See Attached Affidavit

SUBCA.DOC                          Rev. 02/06/10                          Page 1 of 1

27



**CAL-WESTERN RECONVEYANCE CORPORATION**

T.S NO. _1277628-11_

LOAN NO. _4564_

## AFFIDAVIT OF MAILING SUBSTITUTION OF TRUSTEE
### PURSUANT TO CALIFORNIA CIVIL CODE §2934a

STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

THE UNDERSIGNED BEING SWORN, SAY(S):

A COPY OF THE SUBSTITUTION OF TRUSTEE HAS BEEN MAILED, PRIOR TO OR CONCURRENTLY WITH THE RECORDING THEREOF, IN THE MANNER PROVIDED IN SECTION 2934a OF THE CIVIL CODE OF CALIFORNIA, TO ALL PERSONS TO WHOM A COPY OF THE NOTICE OF DEFAULT WOULD BE REQUIRED TO BE MAILED BY THE PROVISIONS OF SUCH SECTION.

Dated: 09/10/10

_____
**Dana Rodriguez**

State of California
County of San Diego

On _SEP 1 0 2010_ before me, _Jeffrey Starling_ , a Notary Public, personally appeared Dana Rodriguez, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.     (Seal)

Signature _____

JEFFREY STARLING
COMMISSION # 1858755
Notary Public - California
SAN DIEGO COUTY
My Comm. Expires Jul 24 2013

ASUB.DOC                                                      Rev. 10/02/09

Cal-Western Reconveyance Corporation
525 East Main Street, El Cajon, California 92020 •P.O. Box 22004, El Cajon, California 92022-9004
TEL: (619) 590-9200 •FAX: (619) 590-9299 • Website: www.cwrc.com

7

# Exhibit "E"



‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

2011-0031799

```
        Recorded      | REC FEE      21.00
   Official Records   |
        County of      |
         Marin         |
   RICHARD N. BENSON   |
   Assessor-Recorder   |
     County Clerk      |
                       | RS
09:39AM 27-Jun-2011 | Page 1 of 2
```

RECORDING REQUESTED BY
And When Recorded Mail To:

CAL-WESTERN RECONVEYANCE
CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004

100245674

APN: 125-592-11
Trustee Sale No. 1277628-11                    Space Above This Line For Recorder's Use

## NOTICE OF TRUSTEE'S SALE

REF: HOWE, PERRY                    TRA:010033
                                    UNVER
Property Address: 128 PINHEIRO CIR, NOVATO CA 94945

### IMPORTANT NOTICE TO PROPERTY OWNER:

YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED **February 20, 2007**. UNLESS YOU
TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF
YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU
SHOULD CONTACT A LAWYER

On **July 18, 2011**, at **3:00pm**, <u>CAL-WESTERN RECONVEYANCE CORPORATION</u>, as duly
<u>appointed trustee</u> under and pursuant to Deed of Trust recorded **February 27, 2007**, as Inst. No. **2007-
0012525**, in book **XX**, page **XX**, of Official Records in the office of the County Recorder of **MARIN**
County, State of **CALIFORNIA** executed by:

**PERRY HOWE AND KARINA LEE HOWE HUSBAND AND WIFE**

WILL SELL AT PUBLIC AUCTION TO HIGHEST BIDDER FOR CASH, CASHIER'S CHECK
DRAWN ON A STATE OR NATIONAL BANK, A CHECK DRAWN BY A STATE OR FEDERAL
CREDIT UNION, OR A CHECK DRAWN BY A STATE OR FEDERAL SAVINGS AND LOAN
ASSOCIATION, SAVINGS ASSOCIATION, OR SAVINGS BANK SPECIFIED IN SECTION 5102
OF THE FINANCIAL CODE AND AUTHORIZED TO DO BUSINESS IN THIS STATE:

**AT THE FRONT ENTRANCE TO THE CITY HALL,
1400 FIFTH STREET
SAN RAFAEL CALIFORNIA**

all right, title and interest conveyed to and now held by it under said Deed of Trust in the property
situated in said County and State described as:

**COMPLETELY DESCRIBED IN SAID DEED OF TRUST**

NOS.DOC                    Rev 10/01/10                    Page 1 of 2

## NOTICE OF TRUSTEE'S SALE

Trustee Sales No. 1277628-11

The street address and other common designation, if any, of the real property described above is purported to be:
**128 PINHEIRO CIR
NOVATO CA 94945**

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

Said sale will be held, but without covenant or warranty, express or implied, regarding title, possession, condition, or encumbrances, including fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust, to pay the remaining principal sums of the note(s) secured by said Deed of Trust. The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is: $957,476.74.

**If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.**

The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located.

FOR SALES INFORMATION: Mon – Fri 9:00am to 4:00pm (619)590-1221
**CAL-WESTERN RECONVEYANCE CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004**

Dated: **June 20, 2011**

CAL-WESTERN RECONVEYANCE CORPORATION

By: _____
Authorized Signature    **Mary J. Statham**

# Exhibit "F"

|||||||| (barcode)

## 2012-0036805

| Recorded | REC FEE | 18.00 |
| Official Records | | |
| County of | | |
| Marin | | |
| RICHARD N. BENSON | | |
| Assessor-Recorder | | |
| County Clerk | | |
| | WS | |
| 10:08AM 27-Jun-2012 | Page 1 of 1 | |

RECORDING REQUESTED BY
FIRST AMERICAN TITLE COMPANY
AS AN ACCOMMODATION ONLY

PREPARED BY AND WHEN
RECORDED MAIL TO:
Pite Duncan, LLP
4375 Jutland Drive, Suite 200
P.O. Box 17933
San Diego, CA 92177-0933
(858) 750-7700

APN: 125-592-11 Code Area 10-033
Property Address: 128 Pinheiro Cir, Novato, California 94945

6517280

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to HSBC Bank USA, National Association as Trustee for Luminent Mortgage Trust 2007-2 all beneficial interest under that certain Deed of Trust dated February 20, 2007, executed by Perry Howe and Karina Lee Howe Husband and Wife, to National City Bank as trustee for National City Mortgage a division of National City Bank, as beneficiary, and recorded as Instrument No. 2007-0012525 on February 27, 2007, in the State of California, Marin County Recorder's Office.

Dated: May 31st 2012

PNC Bank, National Association, successor by merger to National City Mortgage, a division of National City Bank
By: _____
Name: Trisha Payton
Title: Authorized Signer

State of Ohio )
County of Montgomery )
On 05/31/2012 before me, Luann D. Jones, a Notary Public, personally appeared Trisha Payton, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ Ohio _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Luann S. Jones
Notary Public

(notary seal: NOTARY PUBLIC STATE OF OHIO)

LUANN D. JONES
Notary Public, State of Ohio
My Commission Expires March 4, 2015

(This Area for Official Notary Seal)

000012-5042405.002-M

# Exhibit "G"

4 R
  2

2012-0050372

| Recorded | REC FEE | 21.00 |
Official Records
County of
Marin
RICHARD N. BENSON
Assessor-Recorder
County Clerk
|                | RS
10:02AM 17-Aug-2012 | Page 1 of 2

RECORDING REQUESTED BY
And When Recorded Mail To:

CAL-WESTERN RECONVEYANCE
CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004

APN: 125-592-11
Trustee Sale No. 1277628-11          Space Above This Line For Recorder's Use

## NOTICE OF TRUSTEE'S SALE

100245634

TRA:010033
REF: HOWE, PERRY               UNVER
Property Address: 128 PINHEIRO CIR, NOVATO CA 94945

### IMPORTANT NOTICE TO PROPERTY OWNER:

YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED **February 20, 2007**. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER

On **September 06, 2012**, at **3:00pm**, **CAL-WESTERN RECONVEYANCE CORPORATION**, as duly appointed trustee under and pursuant to Deed of Trust recorded **February 27, 2007**, as Inst. No. **2007-0012525**, in book **XX**, page **XX**, of Official Records in the office of the County Recorder of **MARIN** County, State of **CALIFORNIA** executed by:

### PERRY HOWE AND KARINA LEE HOWE HUSBAND AND WIFE

WILL SELL AT PUBLIC AUCTION TO HIGHEST BIDDER FOR CASH, CASHIER'S CHECK DRAWN ON A STATE OR NATIONAL BANK, A CHECK DRAWN BY A STATE OR FEDERAL CREDIT UNION, OR A CHECK DRAWN BY A STATE OR FEDERAL SAVINGS AND LOAN ASSOCIATION, SAVINGS ASSOCIATION, OR SAVINGS BANK SPECIFIED IN SECTION 5102 OF THE FINANCIAL CODE AND AUTHORIZED TO DO BUSINESS IN THIS STATE:

### AT THE FRONT ENTRANCE TO THE CITY HALL,
### 1400 FIFTH STREET
### SAN RAFAEL CALIFORNIA

all right, title and interest conveyed to and now held by it under said Deed of Trust in the property situated in said County and State described as:

### COMPLETELY DESCRIBED IN SAID DEED OF TRUST

NOSb DOC                                                    Page 1 of 2



2b

## NOTICE OF TRUSTEE'S SALE

Trustee Sales No. 1277628-11

The street address and other common designation, if any, of the real property described above is purported to be:
**128 PINHEIRO CIR**
**NOVATO CA 94945**

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

Said sale will be held, but without covenant or warranty, express or implied, regarding title, possession, condition, or encumbrances, including fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust, to pay the remaining principal sums of the note(s) secured by said Deed of Trust. The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is:
**$1,061,219.15.**

**If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.**

The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located.

**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call (619)590-1221 or visit the Internet Web Site WWW.RPPSALES.COM using the file number assigned to this case 1277628-11. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web Site. The best way to verify postponement information is to attend the scheduled sale.

FOR SALES INFORMATION: **(619)590-1221**
**CAL-WESTERN RECONVEYANCE CORPORATION**
**525 EAST MAIN STREET**
**P.O. BOX 22004**
**EL CAJON CA 92022-9004**

Dated: **August 08, 2012**

CAL-WESTERN RECONVEYANCE CORPORATION

By: _____
Authorized Signature

**Roberta K. Cox**

NOSb.DOC

Page 2 of 2

# Exhibit "H"

 **PNC**
MORTGAGE™

September 18, 2013


Perry Howe
Karina Lee Howe
2212 Genoa Street
Danville CA 94506


Re: Loan No. 0005394564

Dear Customer:

We are committed to helping you. Your request for hardship assistance
has been received by our Loss Mitigation Department. However, we have
not received all information necessary to continue the review of your
request.

Please complete and return the following documents by 10/3/2013.
We ask you to fax completed documents to 1-855-288-3974 or mail the
documents to Central Receipts - Loss Mitigation, B6-YM10-01-1, PNC
Mortgage, 3232 Newmark Dr, Miamisburg, OH 45342.

We will attempt to reach you by telephone frequently to obtain the
requested documentation and answer any questions that you may have
regarding this request.

Failure to submit all the required documentation may result in
ineligibility for a foreclosure prevention alternative and the
foreclosure proceedings will continue, including referral to
foreclosure if the mortgage loan was not previously referred.
Depending on the timing of when the necessary information or
documentation is received, there is no guarantee of an evaluation for
a foreclosure prevention alternative and suspension of foreclosure
proceedings.

TIME IS OF THE ESSENCE.  Please complete and return the following
documents.

--Copy of most recent filed federal tax return including all pages and
  schedules signed by all parties.

                                                      LM064

 **PNC** MORTGAGE℠

Loan No. 0005394564
Page 2

Our goal is to help you make informed decisions regarding your
home loan, and we are available to support you through this process.
If you have any questions, please contact your representative
PAMELA S at 1-888-224-4702 ext. 937-072-1135.

Representatives are available Monday through Friday, 8:00 am to
5:00 pm EST.  You can also visit us online at pnc.com/mortgage then
simply click the Customer Service Center, Having Trouble Making
Payments link.

If you would like additional counseling, you may consider contacting
the HOPE Hotline at 1-888-995-HOPE. A project of the nonprofit
Homeownership Preservation Foundation, the HOPE Hotline connects
homeowners with HUD-approved housing counselors, who offer
assistance at no charge.

Sincerely,

PNC Mortgage                              LM064 010 CUU

Please note that the normal collection and/or foreclosure activity
will continue on your loan while your request is being reviewed to the
extent and in the manner permitted under the terms of your note and
security instrument, as well as applicable servicing guidelines and law.

This is an attempt to collect a debt. Any information obtained will be
used for that purpose. However, if you have received a discharge in
bankruptcy affecting our right to collect your loan as a personal
obligation, and if the loan was not reaffirmed in the bankruptcy case,
PNC Mortgage, a division of PNC Bank, National Association will only
exercise its rights against the property itself, and is not attempting
to collect the discharged debt from you personally.

A Division of PNC Bank, National Association        T1 937-910-1200    T2 800-822-5626
3232 Newmark Drive   Miamisburg   OH   45342     P.O. Box 1820   Dayton   OH   45401-1820

# Exhibit "I"

RECORDING REQUESTED BY
And When Recorded Mail To:

CAL-WESTERN RECONVEYANCE LLC
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004

APN: 125-592-11
Trustee Sale No. **1277628-36**                    Space Above This Line For Recorder's Use

# NOTICE OF TRUSTEE'S SALE

[ATTENTION RECORDER: PURSUANT TO CIVIL CODE §2923.3, THE SUMMARY OF INFORMATION REFERENCED BELOW IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.]

**NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED**
**注：本文件包含一个信息摘要**
**참고사항: 본 첨부 문서에 정보 요약서가 있습니다**
**NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO**
**TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP**
**LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY**

TRA:010033
REF: HOWE, PERRY                    UNVER
Property Address: 128 PINHEIRO CIR, NOVATO CA 94945

## IMPORTANT NOTICE TO PROPERTY OWNER:

YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED **February 20, 2007**. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER

On **October 16, 2013**, at **3:00pm**, CAL-WESTERN RECONVEYANCE LLC, as duly appointed trustee under and pursuant to Deed of Trust recorded **February 27, 2007**, as Inst. No. 2007-0012525, in book **XX**, page **XX**, of Official Records in the office of the County Recorder of **MARIN** County, State of **CALIFORNIA** executed by: **PERRY HOWE AND KARINA LEE HOWE HUSBAND AND WIFE**

WILL SELL AT PUBLIC AUCTION TO HIGHEST BIDDER FOR CASH, CASHIER'S CHECK DRAWN ON A STATE OR NATIONAL BANK, A CHECK DRAWN BY A STATE OR FEDERAL CREDIT UNION, OR A CHECK DRAWN BY A STATE OR FEDERAL SAVINGS AND LOAN ASSOCIATION, SAVINGS ASSOCIATION, OR SAVINGS BANK SPECIFIED IN SECTION 5102 OF THE FINANCIAL CODE AND AUTHORIZED TO DO BUSINESS IN THIS STATE: **AT THE FRONT ENTRANCE TO THE CITY HALL, 1400 FIFTH STREET, SAN RAFAEL, CALIFORNIA**

all right, title and interest conveyed to and now held by it under said Deed of Trust in the property situated in said County and State described as: **COMPLETELY DESCRIBED IN SAID DEED OF TRUST**

       NOS1599                                        Page 1 of 8

**NOTICE OF TRUSTEE'S SALE**
Trustee Sales No. 1277628-36

The street address and other common designation, if any, of the real property described above is purported to be:
**128 PINHEIRO CIR
NOVATO CA 94945**

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

Said sale will be held, but without covenant or warranty, express or implied, regarding title, possession, condition, or encumbrances, including fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust, to pay the remaining principal sums of the note(s) secured by said Deed of Trust. The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is:
**$1,097,072.90.**

**If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.**

The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located.

**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call (619)590-1221 or visit the Internet Web Site WWW.DLPPLLC.COM using the file number assigned to this case 1277628-36. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web Site. The best way to verify postponement information is to attend the scheduled sale.

FOR SALES INFORMATION: **(619)590-1221**
**CAL-WESTERN RECONVEYANCE LLC
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004**

Dated: **September 20, 2013**                    CAL-WESTERN RECONVEYANCE LLC

NOS1599                                                                        Page 2 of 8

# Exhibit "J"

 PNC
MORTGAGE™

86-YM07-01-7
P.O. Box 1820
Dayton, Ohio 45401-1820

 46365-0000612-001-1-000-100-000-000

PERRY HOWE
KARINA LEE HOWE
2720 36TH AVE
SAN FRANCISCO CA 94116-2820

## Mortgage Statement

**Statement Date**    11/24/09

### Contact Information

**Customer Service: 1-800-822-5626**
For mortgage account information:
Monday - Thursday, 8am - 9pm (ET),
Friday 8am - 5pm (ET), Saturday 9am - 2pm (ET)

**Correspondence Address Only:**
PNC Mortgage
Attn: Customer Service Research
B6-YM07-01-7
P.O. Box 1820
Dayton, OH 45401-1820

**Online Payment:**  www.pnc.com/mortgage
Click on Pay Online and Other Payment Options

**Important Information for Customers Paying By Check:** When you make a payment with a personal check, you authorize us to use information from your check to make a one-time electronic transfer from your account or to process the payment as a check transaction. This means your account could be debited as early as the same day the payment is received. Your check will no longer be sent to your bank for processing, it will be destroyed and a copy will be retained. Therefore you will no longer receive the original or a copy of your check back from your bank. Also, the way in which the transaction appears on your bank statement will change. Your statement will now show a line item for an electronic entry initiated by PNC Mortgage and will include the check number, payee and the check amount. If you have any questions or do not want us to use information on your check to create a one-time electronic transfer from your account, please contact Customer Service at 1-800-822-5626.

### Payment Summary

| | |
|---|---|
| Payment Effective | 01/01/10 |
| Principal & Interest* | $4,331.60 |
| Regular Payment Due | $4,331.60 |
| Other Fees ** | $9.00 |
| **TOTAL AMOUNT DUE** | **$4,340.60** |

\* Principal not included for Interest Only loans.
\*\* Other fees may include Speedpay, property inspection and document fees.

### Loan Information

| ACCOUNT NUMBER | | 0005394564 |
|---|---|---|
| PROPERTY ADDRESS | 128 PINHEIRO CIR NOVATO CA 94945 | |

| | INTEREST RATE | 6.0000% |
|---|---|---|
| **BALANCES AS OF 11/24/09** | | |
| Principal Balance* | | $866,320.00 |
| Escrow Balance | | $0.00 |
| Unpaid Late Charges | | $0.00 |

\* The Principal Balance is not the total required to pay your loan in full.

| YEAR TO DATE | |
|---|---|
| Interest Paid | $51,979.20 |
| Taxes Paid | $0.00 |

*SEE REVERSE SIDE FOR ADDITIONAL IMPORTANT INFORMATION*

### Transaction Activity

Payments received after 11/24/09 are not reflected in this statement.

| Date | Due Date | Description | Amount Received | Principal | Interest | Escrow | Late Charges/ Other Fees | Misc |
|---|---|---|---|---|---|---|---|---|
| 11/24/09 | 12/1 | Payment | $4,331.60 | $0.00 | $4,331.60 | $0.00 | $0.00 | $0.00 |

**IMPORTANT MESSAGES**

DETACH AND RETURN BOTTOM PORTION WITH YOUR PAYMENT

 PNC
MORTGAGE™

PERRY HOWE
KARINA LEE HOWE

| ACCOUNT NUMBER | PAYMENT DUE DATE | NEXT PAYMENT AMOUNT DUE | PAST DUE AMOUNTS | * TOTAL AMOUNT DUE | IF RECEIVED AFTER CUTOFF | PAYMENT AMT DUE |
|---|---|---|---|---|---|---|
| 0005394564 | 01/01/10 | $4,331.60 | $0.00 | $4,340.60 | 01/16/10 | $4,557.18 |

Make checks payable to PNC Mortgage.    *Includes Other Fees

PNC
MORTGAGE™

P.O. Box 54828
Los Angeles, CA 90054-0828

| | |
|---|---|
| Regular Payment | $ |
| Additional Principal | $ |
| Unpaid Late Charges | $ |
| Return Check Fees | $ |
| **Total Amount Enclosed** | $ |

0005394564830043316000434060000000003

⑇5000⑈0003⑇ 0005394564⑈001